UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| KENNY LATTIMORE and SINCERE SOUL RECORDS, LLC | \* \* \* |
| **Plaintiffs,** | \* \* |
| v. | \* \* \* |
| SRG/ILS GROUP, LLC | \* |
| **Defendant.** | \* \* \* \* |

**February 18, 2026**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## COMPLAINT

### BREACH OF CONTRACT, ACCOUNTING, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING AND VIOLATION OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT (Conn. Gen. Stat. § 42-110a *et seq.*)

Plaintiffs Kenny Lattimore ("Mr. Lattimore") and Sincere Soul Records, LLC ("Sincere Soul") (collectively, "Plaintiffs"), by and through undersigned counsel, bring this Complaint against SRG/ILS Group, LLC ("Defendant" or "SRG"), and allege as follows:

### NATURE OF THE ACTION

This is an action for breach of contract, breach of the implied covenant of good faith and fair dealing, accounting, and violations of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a et seq. ("CUTPA"), arising from SRG's failure to pay royalties owed under a written licensing agreement, failure to provide required quarterly accounting statements,

1

improper charging of unauthorized expenses, and obstruction of Plaintiffs' contractual audit rights.

After recouping its investment by September 2022, SRG continued to exploit Plaintiffs' catalog and generate Net Receipts exceeding $259,945.80 through December 31, 2024. Despite that revenue, SRG has paid Plaintiffs only a single royalty payment of $4,400 in April 2023, while withholding no less than approximately $112,385.25 in royalties owed through December 31, 2024, based on the limited information SRG has produced to date (exclusive of additional royalties that have continued to accrue).

When Plaintiffs exercised their contractual audit rights, SRG deliberately and systematically obstructed the audit process by refusing to produce essential source documentation, rejecting reasonable and industry-standard confidentiality accommodations, and preventing any meaningful independent verification of its accounting.

Upon information and belief, SRG's conduct toward Plaintiffs is not an isolated incident. Rather, SRG has engaged in a broader pattern and practice of similar misconduct toward other recording artists, including failure to timely pay earned royalties, failure to provide required royalty statements, and obstruction of efforts to obtain transparent and verifiable accounting. While Plaintiffs' claims are based on SRG's conduct toward Plaintiffs specifically, this broader context further reflects the knowing and willful nature of SRG's practices.

Plaintiffs attempted to resolve this dispute without litigation, including through written demands and efforts to conduct a contractual audit, but SRG failed to cure its breaches, leaving Plaintiffs no reasonable alternative but to file suit.

As a result of SRG's conduct, Plaintiffs have suffered ascertainable losses and seek damages in excess of $112,385.25, subject to increase based on discovery and additional royalties accrued, together with prejudgment and post-judgment interest, audit costs, punitive damages and other statutory relief under CUTPA, attorneys' fees where authorized by law, and such other legal and equitable relief as the Court deems just and proper.

## **PARTIES**

1. Plaintiff Kenny Lattimore is a natural person and citizen of the State of Louisiana. He is a professional recording artist with a successful career spanning more than 30 years.

2. Plaintiff Sincere Soul Records, LLC is a limited liability company whose sole member is Plaintiff Kenny Lattimore, a citizen of Louisiana. Accordingly, Sincere Soul Records, LLC is a citizen of Louisiana for purposes of diversity jurisdiction.

3. Defendant SRG/ILS Group, LLC is a limited liability company organized under the laws of the State of Connecticut with its principal place of business located at 50 Water Street, Norwalk, Connecticut 06854. SRG conducts business in the music industry as a distribution, licensing, and marketing company for recording artists.

4. Upon information and belief, Claude Villani is a member and principal of SRG and is a citizen of the State of Connecticut.

5. Upon information and belief, all members of SRG are citizens of the State of Connecticut.

## **JURISDICTION AND VENUE**

6. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), as there is complete diversity of citizenship between Plaintiffs (citizens of Louisiana) and SRG (whose members are citizens of Connecticut) and the amount in controversy exceeds $75,000, exclusive of interest and costs.

7. This Court has personal jurisdiction over SRG because SRG is organized under Connecticut law, maintains its principal place of business in Connecticut, and the conduct giving rise to Plaintiffs' claims occurred in Connecticut.

8. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because SRG resides in this District, and pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District, including SRG's breach of contract and its obstruction of the audit process from its Connecticut offices.

## **FACTUAL ALLEGATIONS**

**The Licensing Agreement**

9. On or about May 1, 2021, Plaintiffs and SRG entered into a written licensing agreement titled "Licensing Agreement" (the "Agreement").

10. A true and correct copy of the Agreement is attached hereto as **Exhibit A** and incorporated herein by reference.

11. The Agreement provides that it shall be governed by and construed in accordance with the laws of the State of Connecticut.

12. Pursuant to the Agreement, Plaintiffs granted SRG the right to distribute, market, and license certain master recordings and production created by Mr. Lattimore (the "Masters").

13. Pursuant to the Agreement, Plaintiffs delivered to SRG the master recordings for Mr. Lattimore's album entitled *Here To Stay* and related recordings (the "*Here To Stay*" project), which SRG commercially distributed and exploited during the term of the Agreement.

14. The Agreement remained in effect at all times relevant to the breaches alleged herein.

**Revenue Split and Payment Terms**

15. Under the Revenue Split section of the Agreement, all Net Receipts are to be divided equally: 50% to SRG and 50% to Plaintiffs.

16. The term "Net Receipts" includes all revenues generated from the exploitation of the Masters, including but not limited to mechanical royalties, streaming income, downloads, sync licenses, physical sales, and all other income streams.

17. The Agreement expressly requires SRG to provide Plaintiffs with quarterly accounting statements and corresponding royalty payments within thirty (30) days of the end of each calendar quarter: March 31st, June 30th, September 30th, and December 31st.

18. The Agreement does not authorize SRG to charge back distribution fees on physical and digital distribution channels against Plaintiffs' royalty account.

19. The Agreement does not authorize SRG to charge any consulting fees or other expenses without Plaintiffs' prior written approval.

**Plaintiffs' Performance**

20. Plaintiffs have fully performed all obligations required under the Agreement, including but not limited to:

    a.  Delivering the musical recordings, masters, and production to SRG;

    b.  Maintaining and protecting all intellectual property rights in the musical recordings;

    c.  Cooperating with SRG's distribution and marketing efforts; and

    d.  Complying with all other terms and conditions of the Agreement.

**Recoupment and Income Generation**

21. Under the Agreement, SRG was entitled to recoup certain expenses and advances from revenues generated before Plaintiffs became entitled to receive royalty payments.

22. By no later than September 2022, SRG had fully recouped all expenses and advances, such that Plaintiffs became entitled to receive their 50% share of Net Receipts beginning in or around September 2022.

23. From September 2022 through December 2024 and continuing to the present, SRG has generated substantial revenues from the exploitation of Mr. Lattimore's musical recordings.

24. Upon information and belief, the *Here To Stay* project and related recordings have generated significant streaming income on platforms including but not limited to Spotify, Apple Music, Tidal, Sound Exchange, Sirius XM Radio, YouTube, and Amazon Music.

25. Upon information and belief, SRG has received substantial Net Receipts from Universal Music Group ("UMG"), Virgin Music Group ("VMG"), and other distribution partners and licensees.

26. Upon information and belief, the total Net Receipts generated during the period from May 1, 2021 through December 31, 2024 exceeded $259,945.80.

27. The December 31, 2024 end date reflects the period covered by Mr. Lattimore's and Sincere Soul's audit request and the limited accounting records SRG has produced to date; SRG has continued to exploit the Masters and generate Net Receipts thereafter.

**SRG's Failure to Pay Royalties**

28. Following recoupment (no later than September 2022), SRG was required to remit Plaintiffs' fifty percent (50%) share of Net Receipts on a quarterly basis within thirty (30) days after each calendar quarter-end.

29. The only royalty payment SRG has made to Plaintiffs during the entire term of the Agreement is a single payment of $4,400.00 in April 2023.

30. That $4,400 payment was miscalculated, was not accompanied by a contract-compliant quarterly royalty statement, and did not satisfy SRG's royalty payment obligations under the Agreement.

31. SRG failed to remit Plaintiffs' royalties within thirty (30) days following each calendar quarter-end from the quarter ending September 30, 2022 through the quarter ending December 31, 2024, inclusive, with each such failure constituting a separate and independent

material breach of the Agreement. A schedule identifying the quarterly periods for which payment was due and not paid is attached hereto as **Exhibit C.**

32. SRG's repeated failures to pay constitute ongoing and continuing breaches of the Agreement.

33. Based on the accounting records SRG has provided to date, SRG owes Plaintiffs no less than $112,385.25 in unpaid royalties (calculated as total royalties of $116,785.25 less the single payment of $4,400.00 made in April 2023). This amount is derived from limited and incomplete information produced by SRG and does not include royalties that have accrued since December 31, 2024. The actual amount owed is therefore likely substantially higher and will be determined through a full accounting and discovery.

**SRG's Failure to Provide Required Accounting Statements**

34. In addition to its royalty payment obligations, SRG is contractually required to provide Plaintiffs with detailed quarterly accounting statements showing all income generated from the Masters and all expenses charged against that income.

35. SRG has failed to provide complete, accurate, and timely quarterly accounting statements as required by the Agreement, depriving Plaintiffs of the ability to verify amounts owed, track performance of the Masters, or meaningfully exercise their contractual rights.

36. Mr. Lattimore's manager repeatedly requested overdue royalty payments and the quarterly accounting statements required under the Agreement throughout 2023, including on or about April 12, 2023 and July 25, 2023 via email to SRG. SRG ignored, delayed, or provided inadequate responses to Plaintiffs' requests and failed to cure its ongoing payment and accounting deficiencies.

37. Each of SRG's failures to provide a quarterly accounting statement when due constitutes a separate and distinct breach of the Agreement.

**Improper Deductions, Unauthorized Chargebacks, and Marketing Recoupment**

38. SRG improperly deducted and charged unauthorized expenses against Plaintiffs' royalty account in calculating Net Receipts, thereby artificially reducing the royalty base from which Plaintiffs' contractual fifty percent (50%) share was to be paid.

39. The unauthorized charges identified herein appear in SRG's own accounting records and project-level financial summaries produced to Plaintiffs, including the "2023 Project Album Data" spreadsheet and related internal accounting materials. These documents reflect that SRG deducted such expenses prior to calculating Net Receipts, thereby reducing the royalty base from which Plaintiffs' share was determined.

40. The Agreement provides that SRG "agrees to assign a budget of $75,000 to one release by the artist Kenny Lattimore," to be mutually discussed and used for music videos, radio promotion, advertising, photography, and related marketing expenses.

41. The Agreement further provides that the direct cost of SRG's internal PR agency "will not be charged back to Company or impact the assigned budget."

42. The Agreement does not state that the $75,000 marketing budget is recoupable from Plaintiffs' royalties, nor does it authorize SRG to deduct such expenditures from Net Receipts absent mutual approval.

43. Upon information and belief, SRG expended approximately $26,375.30 of the assigned marketing budget.

44. Despite repeated written requests from Mr. Lattimore and his representatives for an accounting of the remaining marketing funds and requests to deploy the remaining balance for radio promotion and related marketing efforts, SRG failed and refused to release or utilize the remaining budget.

45. Instead, SRG treated the marketing expenditures as recoupable and deducted those amounts from Plaintiffs' royalty account, thereby reducing Net Receipts and Plaintiffs' fifty percent (50%) share, despite the absence of any contractual provision authorizing such recoupment.

46. In addition to improperly recouping marketing expenditures, SRG charged other unauthorized expenses against Plaintiffs' royalty account, including but not limited to:

a) Public relations expenses in the amount of $2,500.00 per month from an entity known as 2R's Entertainment, in direct violation of the Agreement's express provision that "the direct cost of the SRG/ILS internal PR agency will not be charged back to Company or impact the assigned budget";

b) An unapproved and unauthorized consulting fee for an individual named Chris Isisdori in the amount of $2,524.00, for which Plaintiffs never provided authorization;

c) Distribution fees on physical and digital distribution channels, which are not authorized deductions under the Agreement; and

d) Other expenses that were not properly calculated at the 50/50 revenue split required by the Agreement.

47. These improper deductions and unauthorized recoupments further reduced the Net Receipts reflected in SRG's accounting records and increased the amount of royalties withheld from Plaintiffs.

48. Despite SRG's refusal to utilize the remaining marketing budget, Mr. Lattimore expended substantial personal funds – estimated to exceed $100,000 – to promote the album in order to support the commercial performance of the release. Those efforts by Mr. Lattimore contributed to significant commercial success, including a Billboard No. 1 single and a Billboard Top 5 single during the term of the Agreement.

49. SRG's improper deductions, unauthorized recoupment of marketing expenditures, and related chargebacks constitute material breaches of the Agreement and have caused Plaintiffs to suffer financial damages by inflating deductions and reducing Plaintiffs' contractual royalty share.

50. SRG's failures to pay, properly account, permit meaningful audit access, and refrain from unauthorized deductions each constitute independent material breaches of the Agreement.

**Plaintiff's Demand Letter and Audit Notice (October 2024)**

51. On or about October 21, 2024, Plaintiffs, through their counsel at Holland & Knight LLP, sent SRG a formal demand letter ("2024 Demand Letter") via certified mail and email to Michael Cusanelli at SRG's Connecticut address.

52. A copy of the 2024 Demand Letter is attached hereto as **Exhibit B** and incorporated herein by reference.

53. The 2024 Demand Letter identified SRG's material breaches of the Agreement, including failure to pay earned royalties and failure to provide required quarterly accounting statements; demanded immediate payment and compliance with SRG's accounting obligations; provided notice of Plaintiffs' intent to exercise their contractual audit rights; requested preservation of relevant records; and advised that Plaintiffs would pursue legal remedies if SRG failed to cure within seven (7) days.

54. SRG received the 2024 Demand Letter but failed to pay the outstanding royalties within seven (7) days or at any time thereafter.

55. SRG failed to provide the requested accounting statements.

**Audit Rights**

56. The Agreement contains an audit provision (the "Audit Provision") granting Plaintiffs the right to inspect and conduct a formal audit of SRG's books and records pertaining to the sales and licensing of the Masters and production.

57. Specifically, the Agreement provides that Plaintiffs or their designated representative may conduct an inspection at their sole expense and/or a formal audit, including without limitation the activities of examining, copying, and auditing the books and records of SRG, provided that Plaintiffs give SRG at least thirty (30) days prior written notice of a formal audit.

58. The Audit Provision further stipulates that if any audit reveals that amounts owed to Plaintiffs by SRG exceed the amounts actually paid by more than ten percent (10%) of the total amount owed to Plaintiffs as of the audit date, SRG shall reimburse Plaintiffs for their reasonable, out-of-pocket costs of such audit or inspection.

**Plaintiffs' Exercise of Audit Rights**

59. In the 2024 Demand Letter Mr. Lattimore and Sincere Soul formally requested to conduct an audit of SRG's books and records for the period from May 1, 2021 through December 31, 2024.

60. On or about December 18, 2024, Plaintiffs engaged Adam Sheer, CPA, of Miller Kaplan LLP (the "Auditor"), an independent certified public accountant with extensive experience conducting music industry royalty audits, to perform the formal audit on their behalf.

61. Mr. Lattimore and Sincere Soul complied with all contractual requirements necessary to conduct a formal audit under the Agreement.

**SRG's Obstruction of the Audit Process**

62. Despite Plaintiffs' lawful exercise of their contractual audit rights and despite the Auditor's professional and good faith efforts to conduct the audit, SRG systematically obstructed the audit process and prevented any meaningful independent verification of its accounting.

**A. Refusal to Provide Third-Party Documentation**

1. SRG insisted that the Auditor rely solely on SRG's own internal records and summaries.

2.  To that end, SRG refused to provide Plaintiffs' Auditor with access to original source
    documentation – including third-party distribution statements, royalty statements,
    payment reports, and other foundational records from distribution partners such as
    Universal Music Group ("UMG") and Virgin Music Group ("VMG") – and instead
    insisted the Auditor rely solely on SRG's internal summaries and records.

3.  Access to such third-party source documentation is necessary to independently verify the
    revenues received, deductions taken, and Net Receipts calculated under the Agreement.
    By withholding these materials, SRG prevented Plaintiffs from conducting a meaningful
    and independent audit as the Audit Provision provides.

## B.  Rejection of Reasonable Confidentiality Accommodations

1.  During the audit process, the Auditor proposed multiple reasonable and industry-standard
    accommodations to address SRG's stated confidentiality concerns including:  (a)
    redaction of other artists' information, (b) sample-based review of records thereby
    reducing the volume of confidential information disclosed, (c) a view only screenshare
    where the auditor could view the data on screen but not retain it, and (d) on-site review
    where the auditor could review information directly on SRG's computer systems
    ensuring confidential information never left SRG's custody.

2.  In addition, the Auditor entered into a non-disclosure agreement with SRG specifically to
    facilitate review of confidential third-party information and source documentation.

3.  Despite these accommodations and the Auditor's reasonable proposals and good-faith
    efforts, SRG rejected or refused to permit all such alternatives and failed to provide
    meaningful access to the records necessary to complete the audit.

**C. Refusal to Provide Specific Requested Documents**

1. In or about April 2023, SRG's representative Michael Cusanelli provided Plaintiffs' manager with an internally prepared Excel spreadsheet titled "2023 Project Album Data," which SRG represented reflected certain project-level revenue and expense figures for the *Here To Stay* project.

2. SRG provided the 2023 Project Album Data spreadsheet without objection, hesitation, or any assertion that the spreadsheet was confidential or could not be shared with Plaintiffs' representatives.

3. During the audit process, Plaintiffs' independent auditor repeatedly requested the updated "2024 Project Album Data" spreadsheet reflecting the same categories of revenue and expense information, but SRG refused to produce it despite at least six (6) separate requests.

4. SRG's refusal prevented Plaintiffs and the Auditor from obtaining a complete and accurate accounting and from determining the full extent of SRG's underpayment. Notwithstanding SRG's obstruction, the Auditor determined – based on the limited information SRG did provide – that SRG underpaid Plaintiffs during each of the nine royalty statement periods reviewed.

63. SRG's refusal to provide the requested documentation constituted willful noncompliance with Plaintiffs' contractual audit rights and a material breach of the Agreement.

64. SRG's obstruction was followed by coercive efforts to pressure Mr. Lattimore to abandon his claims.

**Improper Direct Contact, Threats, and Coercive Settlement Pressure**

65. On or about January 9, 2025, through their legal counsel, Plaintiffs expressly instructed SRG
    and its representatives not to contact Mr. Lattimore directly and to direct all communications
    regarding this dispute through Plaintiffs' legal counsel.

66. Despite this clear instruction, on or about February 25, 2025, Dominique Zarka ("Zarka"), an
    individual associated with or acting on behalf of SRG, contacted Mr. Lattimore directly.

67. In his February 25, 2025 communication to Mr. Lattimore, Zarka stated in substance as
    follows:

    *"While this is not to be taken as a threat, I can guarantee you that Claude's patience is
    running out and you can expect some form of counterclaim/lawsuit to come from SRG-ILS
    unless this matter is settled in short order and again you will need to appear in court in
    Connecticut to testify at your expense."*

68. Zarka's communication was improper and was clearly intended to intimidate and pressure
    Mr. Lattimore to abandon or compromise Plaintiffs' legitimate contractual claims against
    SRG.

69. The communication also falsely suggested that Mr. Lattimore would necessarily be required
    to appear and testify "at [his] expense," when Plaintiffs are entitled to seek recovery of
    attorney's fees and costs incurred in this action under applicable law.

70. Zarka's direct contact and threatening statements – after SRG had been expressly instructed
    that Mr. Lattimore was represented by counsel – were undertaken on behalf of SRG and
    constitute further evidence of bad faith and unfair business conduct in connection with this
    dispute.

**Bad-Faith Settlement Demands and Withholding of Earned Royalties**

71. During negotiations regarding a proposed termination of the parties' relationship, SRG
    sought to characterize its proposed agreement as a settlement and release of claims,
    notwithstanding that SRG did not offer any consideration beyond payment of a portion of
    royalties that Plaintiffs were already contractually entitled to receive.

72. SRG conditioned payment of a portion of those undisputed royalties on Mr. Lattimore's
    execution of a broad general release of legal claims, including claims for breach of contract
    and related statutory violations, while continuing to withhold material financial information
    necessary for Plaintiffs to evaluate the scope and value of the claims SRG demanded be
    released.

73. In addition, SRG sought to obtain a release of claims relating to future royalties and ongoing
    exploitation of Mr. Lattimore's recordings, including royalties accruing during 2025, despite
    failing to provide complete accounting statements reflecting those revenues.

74. SRG continued to exploit Mr. Lattimore and Sincere Soul's musical recordings and generate
    revenues during these negotiations while withholding payment and using undisclosed and
    unpaid royalties as leverage to secure a release.

75. SRG's conduct – demanding a sweeping release without independent consideration,
    concealing material royalty information, seeking release of future claims, and continuing to
    withhold earned and accruing royalties during negotiations – constituted bad faith, coercion,
    and unfair business practices.

**SRG's Pattern and Practice of Similar Misconduct Toward Other Artists**

76. In addition to the breaches suffered by Plaintiffs, SRG has engaged in similar misconduct toward other artists, reflecting a broader and systematic pattern of withholding royalties, failing to provide required statements, and obstructing transparency.

**SRG Artist *After 7***

77. Upon information and belief, SRG engaged in similar misconduct toward the recording group *After 7*, including prolonged failure to pay earned royalties, failure to provide accurate and timely royalty statements, and failure to maintain transparent and verifiable accounting records during the term of their agreement.

78. Upon information and belief, for a period exceeding one year, *After 7* repeatedly requested payment and accounting of earned royalties, and SRG delayed, deflected, and failed to provide meaningful responses, supporting documentation, or timely payment. During that period, SRG provided *After 7* with an accounting statement that was materially inaccurate and grossly misleading, including by representing that *After 7* had not yet recouped.

79. Upon information and belief, SRG's prolonged nonpayment and lack of transparency forced *After 7* to retain an independent music industry auditor and engage legal counsel in order to determine the royalties owed and to compel SRG to comply with its contractual obligations. Upon information and belief, SRG ultimately issued payment only after extended delay, repeated demands, and retention of counsel and auditors, rather than in the ordinary course of business.

**SRG Artist John Brown – *J. Brown***

80. Upon information and belief, SRG engaged in similar misconduct toward the recording artist J. Brown, including failure to timely pay earned royalties, failure to provide accurate and complete royalty statements, and failure to maintain transparent and verifiable accounting records during the term of his agreement.

81. Upon information and belief, despite achieving significant commercial success during the term of his agreement, including multiple chart-topping releases, SRG failed to pay J. Brown the royalties owed for the exploitation of his music and failed to provide the accounting necessary to verify amounts due.

82. Upon information and belief, SRG terminated its agreement with J. Brown while representing that he could retrieve his master recordings, yet failed to remit all earned royalties attributable to exploitation during the contract term and failed to provide complete royalty statements or proper recordkeeping.

83. Upon information and belief, SRG has not fully paid J. Brown the royalties owed to him as of the filing of this Complaint.

## COUNT I – BREACH OF CONTRACT

84. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

85. In May of 2021, Plaintiffs and Defendant entered into the Licensing Agreement attached as **Exhibit A.**

86. At all relevant times, the Agreement was valid, binding, and enforceable.

87. Plaintiffs have performed all obligations required of them under the Agreement.

88. Under the Agreement, Defendant was obligated, among other things, to:

    a. Pay Plaintiffs fifty percent (50%) of all Net Receipts generated from exploitation of the Masters, on a quarterly basis and within thirty (30) days following each calendar quarter-end;

    b. Provide complete and accurate quarterly accounting statements within thirty (30) days following each calendar quarter-end;

    c. Refrain from charging unauthorized or contractually prohibited expenses against Plaintiffs' royalty account; and

    d. Comply with the Agreement's audit provision by providing access to the books, records, and documentation necessary to verify revenues, deductions, Net Receipts, and royalty calculations.

89. Defendant materially breached the Agreement by failing to pay Plaintiffs their contractually required share of Net Receipts when due, including for the quarters identified in **Exhibit C.**

90. Defendant materially breached the Agreement by failing to provide complete, accurate, and timely quarterly accounting statements as required by the Agreement.

20

91. Defendant materially breached the Agreement by charging unauthorized and/or contractually prohibited expenses against Plaintiffs' royalty account, thereby reducing Net Receipts payable to Plaintiffs.

92. Defendant materially breached the Agreement by failing to comply with Plaintiffs' contractual audit rights, including by refusing to provide the records and source documentation necessary to verify revenues received, deductions taken, and Net Receipts calculated.

93. As a direct and proximate result of Defendant's breaches, Plaintiffs have suffered damages, including unpaid royalties, improperly deducted amounts, audit-related costs, and loss of use of funds, in an amount to be proven at trial. Plaintiffs' damages also include amounts improperly reduced through unauthorized deductions and recoupment, including marketing expenditures treated as recoupable contrary to the express terms of the Agreement.

94. Defendant's breaches are ongoing, and Plaintiffs are entitled to recover all damages and other relief available under law and equity.


## COUNT II – BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

95. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

96. At all relevant times, Plaintiffs and Defendant were parties to a valid and enforceable Licensing Agreement governing the distribution, exploitation, accounting, and payment of royalties derived from Plaintiffs' musical recordings.

97. Under Connecticut law, every contract carries an implied covenant of good faith and fair dealing, which requires that neither party do anything to injure the right of the other to receive the benefits of the agreement. The implied covenant is breached when a party, in bad faith, engages in conduct that impedes the other party's right to receive the benefits reasonably expected under the contract.

98. The Agreement placed Defendant in exclusive control of key performance obligations, including royalty accounting, reporting, access to supporting records, and payment of Plaintiffs' share of Net Receipts. SRG was therefore required to exercise that control honestly, fairly, and in good faith, consistent with Plaintiffs' reasonable contractual expectations.

99. Defendant's conduct alleged in this Count is not limited to a mere failure to perform express contractual duties, but also includes bad-faith misuse of contractual discretion and control to deprive Plaintiffs of the fruits of the Agreement.

100. SRG breached the implied covenant of good faith and fair dealing by exercising its contractual discretion and control in bad faith and in a manner intended to deprive Plaintiffs of the benefits reasonably expected under the Agreement, including but not limited to:

    a. Refusing to provide the books, records, and source documentation necessary to verify revenues and Net Receipts;

b.   Rejecting reasonable confidentiality accommodations proposed by Plaintiffs'
independent auditor;

c.   Withholding material financial information necessary for Plaintiffs to evaluate the
accuracy of SRG's accounting and the full scope of royalties owed;

d.   Continuing to exploit Plaintiffs' musical recordings and generate revenues while
refusing to provide transparency or remit payment;

e.   Conditioning payment of undisputed, contractually owed royalties on Plaintiffs'
execution of a broad general release of claims without independent consideration; and

f.   Using SRG's superior access to financial information to pressure Plaintiffs to
abandon or compromise valid contractual claims.

101. SRG's conduct was intentional, knowing, and undertaken in bad faith and was designed to
frustrate Plaintiffs' ability to receive the fruits of the Agreement, including timely royalty
payments, transparent accounting, and meaningful audit rights.

102. As a direct and proximate result of SRG's breach of the implied covenant of good faith and
fair dealing, Plaintiffs have suffered damages, including but not limited to unpaid royalties,
loss of use of funds, audit costs, and related financial harm, in an amount to be proven at
trial.

103. Plaintiffs are entitled to recover all damages proximately caused by SRG's breach of the
implied covenant of good faith and fair dealing, together with such other relief as the Court
deems just and proper.

## COUNT III – ACCOUNTING

104. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

105. SRG has been in exclusive possession, custody, and control of the books, records, and source documentation necessary to determine all revenues, receipts, deductions, and Net Receipts derived from the exploitation of Plaintiffs' Masters, including without limitation third-party distribution statements, license agreements, payment reports, and underlying transactional data.

106. The amounts due cannot be determined with reasonable certainty from information available to Plaintiffs because SRG has failed to provide complete, accurate, and verifiable accounting statements and has withheld material source documentation, including third-party distribution statements and underlying transactional data. The relevant information is uniquely within SRG's possession and control, and Plaintiffs have no adequate remedy at law to ascertain the full extent of revenues received, deductions taken, and royalties owed without a court-ordered accounting.

107. Plaintiffs therefore seek an equitable accounting requiring SRG to render a full, true, and complete accounting of all revenues and Net Receipts derived from the Masters, including without limitation:

    a.      identification of all revenue sources;

    b.      production of all quarterly royalty statements;

    c.      production of all third-party distribution statements and source documentation supporting amounts received and deductions taken;

    d.      all marketing expenditures charged, recouped, or deducted, and the contractual basis for each; and

    e.      a reconciliation showing amounts paid and amounts due to Plaintiffs from May 1, 2021 through the present, including through the date of judgment.

108. Plaintiffs further request such additional equitable relief as is necessary to effectuate the accounting, including an order compelling production of the records described above and, if appropriate, an order directing payment of all amounts determined to be due following the accounting, together with applicable interest and audit costs as authorized by the Agreement and/or applicable law.

## COUNT IV - VIOLATION OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT (Conn. Gen. Stat. § 42-110a et seq.)

109. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

110. The Connecticut Unfair Trade Practices Act, § 42-110a, *et seq.* ("CUTPA") provides that "[no] person shall engage in unfair methods of competition or deceptive acts or practices in the conduct of any trade or business."

111. At all relevant times, Defendant was engaged in trade or commerce within the meaning of CUTPA, including the commercial distribution, licensing, accounting, and monetization of musical recordings on behalf of recording artists.

25

112. Defendant's conduct, as alleged herein, constitutes unfair and deceptive acts and practices in violation of CUTPA and reflects substantial aggravating circumstances beyond a mere breach of contract.

113. Defendant engaged in a systematic course of conduct designed to withhold earned royalties, conceal material financial information, obstruct contractual audit rights, and leverage its superior access to accounting records to pressure Plaintiffs into relinquishing legal claims.

114. Such conduct included, but was not limited to:

    a.  Systematically failing to pay Plaintiffs royalties that Defendant knew were contractually earned, while continuing to commercially exploit Plaintiffs' musical recordings for Defendant's own financial benefit;

    b.  Knowingly concealing and withholding material third-party royalty statements and source documentation necessary to verify Net Receipts, thereby preventing Plaintiffs from discovering the full extent of Defendant's underpayment;

    c.  Failing to provide accurate, complete, and timely royalty statements while representing, expressly or implicitly, that Plaintiffs' royalty accounts were being properly maintained;

    d.  Improperly charging unauthorized expenses against Plaintiffs' royalty account in direct contravention of express contractual provisions;

e.  Obstructing Plaintiffs' contractual audit rights and refusing to provide source documentation necessary to verify revenues and Net Receipts and rejecting reasonable, industry-standard confidentiality accommodations;

f.  Failing and refusing to utilize and account for the contractually assigned $75,000 marketing budget, while improperly treating marketing expenditures as recoupable and deducting them from Plaintiffs' royalty base contrary to the Agreement;

g.  Conditioning payment of undisputed, contractually owed royalties on Plaintiffs' execution of a broad general release of claims while withholding material financial information and offering no independent consideration.

115. Defendant's above-described conduct was unfair and deceptive within the meaning of CUTPA in that it was deceptive, immoral, unethical, oppressive, unscrupulous, and contrary to established public policy favoring transparency, honest accounting, and fair dealing in commercial relationships.

116. Defendant's unfair and deceptive practices caused substantial injury to Plaintiffs, including the withholding of earned royalties, improper deductions, audit-related costs, and attorneys' fees and expenses incurred to investigate, counter, and rectify Defendant's misconduct. This injury was not outweighed by any countervailing benefit to competition or consumers and was not reasonably avoidable by Plaintiffs.

117. Defendant's unfair and deceptive acts and practices were knowing, willful, and at minimum reckless.

118. As a direct and proximate result of Defendant's unfair and deceptive acts and practices, Plaintiffs have suffered an ascertainable loss of money and property and have been damaged.

119. Plaintiffs are entitled to all relief available under CUTPA, including actual damages, punitive damages, attorneys' fees, costs, and appropriate injunctive relief.

**Financial Harm and Damages**

120. Based on the limited financial records Defendant has produced to date and the analysis performed by Plaintiffs' independent music industry auditor, Plaintiffs have determined that Defendant owes Plaintiffs no less than approximately $112,385.25 in unpaid royalties through December 31, 2024, exclusive of additional royalties that have continued to accrue.

121. In addition, Plaintiffs allege that Defendant improperly treated certain marketing expenditures as recoupable and deducted them from Plaintiffs' royalty base contrary to the Agreement, further reducing Net Receipts and causing Plaintiffs' damages to be greater than the amounts reflected in the limited records produced to date.

122. Plaintiffs have also incurred additional losses, including improper deductions, loss of use of funds, and audit-related costs, and the full amount of Plaintiffs' damages cannot be determined without a complete accounting and discovery.

## **PRAYERS FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request the following relief:

A. Compensatory damages for SRG's breaches of contract and breach of the implied covenant of good faith and fair dealing, including but not limited to unpaid royalties, improperly deducted revenues, and loss of use of funds;

B. An order requiring SRG to provide a full, true, and complete accounting of all revenues, receipts, deductions, and Net Receipts derived from the exploitation of Plaintiffs' Masters from May 1, 2021 through the date of judgment, including production of all underlying books, records, and third-party source documentation necessary to verify such amounts;

C. An order directing SRG to pay all amounts determined to be due and owing to Plaintiffs as a result of the accounting, together with applicable interest and audit costs as authorized by the Agreement and/or applicable law;

D. Injunctive relief as appropriate to prevent SRG from continuing to withhold royalty payments, accounting statements, and source documentation, and to require SRG's compliance with its contractual and statutory obligations;

E. An order requiring SRG to cease all further distribution, licensing, exploitation, or monetization of the Masters upon termination or rescission of the Agreement, including termination resulting from SRG's material breach.

F. Statutory relief under the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a et seq., including actual damages, punitive damages, reasonable attorneys' fees, and costs;

G. Pre-judgment and post-judgment interest at the maximum rate permitted by law;

H. Costs of suit incurred herein; and

I. Such other and further legal and equitable relief as the Court deems just and proper.

Respectfully submitted this 18th day of February 2026,

PLAINTIFFS, KENNY LATTIMORE AND
SINCERE SOUL

BY:

Law Office of
W. Martyn Philpot, Jr.
409 Orange Street
New Haven, CT 06511-6406
Tel. No. (203) 624-4666
Federal No. ct05747
lawoffice@philpotlaw.net


Felton T. Newell (Pro Hac Vice Forthcoming)
1801 Century Park East, 24th floor
Los Angeles, CA 90067
Office:  310-556-9663
Felton@newellpc.com
**Counsel for Plaintiffs**


The Plaintiffs requests a trial by jury.

# EXHIBIT A



### License Agreement

| | |
|---|---|
| LICENSOR: | The SRG/ILS Group LLC, (the "Licensee") referred herein as "SRG/ILS⁰, 50 Water Street, Norwalk, Connecticut, 06854. |
| COMPANY: | SincereSoul Records, LLC, f/s/o Kenny Lattimore, referred herein as "Company", located at 19300 Rinaldi Street #8107, Porter Ranch, CA 91327. |
| TERRITORY: | World |
| EFFECTIVE DATE: | MAY 1st. 2021 |
| TERM• | The Initial term (the "Term") of this license will be sixty (60) months plus a six (6) month sell off period for physical goods. Licensor will not manufacture any new phystcal goods during the sell off period |
| MASTER RECORDING AND ART | For all releases designated by Company, Company will deliver a fully mixed and mastered DDP files as well as all components necessary to design and manufacture for all formats of release including CD and digital (download and streaming) and full meta data associated with the release. |
| GRANT OF RIGHTS IN THE RECORDINGS/MASTER. | Company hereby grants to SRG/ILS for the term, subject to the sell off penod the exclusive distribution and license rights for all releases Company delivers to SRG/ILS. Company is prohibited from commercially releasing any musc whereby Kenny Lattimore is the main Artist for twelve (12) months from the release of any Kenny Lattimore recordings covered by this agreement without express wntten approved from SRG/ILS. |
| PERFORMANCE OBLIGATIONS: | SRG/ILS shall commercially release the masters throughout the TERRITORY via its pre-existing distribution agreement with the Universal Music Group upon delivery of the master DDP and artwork. |
| PRESS,  RADIO,  MARKETING  & PROMOTIONAL SUPPORT: | SRG/ILS agrees to assign a budget of $75,000 to one (1 ) release by the Artist Kenny Lattimore- Company, and SRG/ILS will mutually discuss the use of this budget for Music Videos, Radio Promotion, Advertising, Photography, and other associated items.<br><br>The direct cost of the SRG/ILS internal PR agency will not be charged back to Company or impact the assigned budget. Any associated costs including but not limited to travel, media support, third-party vendors may be included in Net Receipts and would be subject to mutual approval by both Company and SRG/ILS before any expense in incurred.<br><br>Any and all payments must be mutually pre-approved by Company and Licensor and will be paid by SRG/ILS directly to vendor after an authorized invoice is received. |
| DESIGN & MANUFACTURING: | SRG/ILS agrees to fully design and manufacture compact discs for distribution in mutually agreed upon markets and quantities. All necessary UPC and ISRC codes will be provided by SRG/ILS. |
| CREATIVE CONTROL: | Creative control over the marketing, packaging, formats and promotion thereof shall be subject to mutual agreement by the parties hereto provided Company reserves final and reasonable approval. |



| | |
|---|---|
| **RIGHTS:** | Company grants to SRG/ILS all Rights throughout the TERRITORY, through all channels of retail distribution including physical, digital download and socalled audio and video streaming rights. Any premium sales or other non-retail sales are subject to Company prior written approval. |
| **GROSS RECEIPTS (Definition):** | Any and all income actually received by SRG/ILS from the sale or other exploitation of the masters (the "Masters"). |
| **NET RECEIPTS (Definition):** | Net Receipts shall mean the Gross Receipts less reasonable and direct costs incurred or expended by SRG/ILS solely associated to Company and CompanVs Masters in respect of such exploitation and organization. including mthout limitation, all mutually agreed upon advances, mechanical royalties, recording, clearance, and delivery costs for the masters, travel. lodging accommodations, marketing, radio, and promotion costs, retail co-op, physical and digital distribution third party fees, licensing or manufactunng of the Recordings, any applicable taxes associated therewith; for further clarification all costs actually paid by SRG/ILS that are associated with the sale and other exploitation of the "Masters", including but not limited to manufacturing, warehousing, distribution, sales and licensing, including but not limited to reasonable commissions and reasonable fees due and payable to third party personnel. |
| **REVENUE SPLIT:** | Ail NET RECEIPTS will be divided 50% to COMPANY and 50% to SRG/ILS. |
| **MECHANICAL ROYALTIES:** | All Mechanical Royalties will be paid by SRG/ILS and included in Net Receipts as defined above. |
| **NAME AND LIKENESS:** | Company grants to SRG/ILS, during the Term and Territory, the rights to and to authorize other persons to reproduce, print, publish and disseminate the approved name, approved pictures and approved likenesses and approved biographical material of the Company solely in connection With the distribution, exhibition, advertising, promotion and exploitation of the "Masters". |
| **SALES TO COMPANY:** | $4.00 (Basic CD forrnat) plus reasonable shipping and handling. |
| **ACCOUNTING:** | Accounting and corresponding payment quarterly within 30 days of March 31 $^{st}$, September 30$^m$, June 30th and December 31 $^{st}$. |
| **AUDITS:** | Company or their designated representative may conduct an inspection at its sole expense and/or a formal audit (including, without limitation, the activities of examining, copying and auditing) of the books and records of SRG-ILS pertaining to sales and licensing of the Master and Production, provided Company gives SRG-ILS at least thirty days [30] days prior written notice of a formal audit, that such audits be limited to one audit per calendar year and that the audit be conducted during normal business hours. If any amount is found to be owing to Company by SRG/ILS and if the amount owing is more than 10 per cent of the total amount owing to Company as at the audit date, SRG/ILS shall reimburse Company for their reasonable, out-of-pocket costs of such audit or inspection. |
| **ASSIGNMENT AND ENUREMENT:** | SRG/ILS may not assign rights under this agreement without the prior written approval of Company except to a wholly owned and controlled subsidiary that is in the primary business of sale and distribution of recorded music. Company may not assign any of their rights or obligations under this Agreement, other than to an entity wholly owned and controlled by them. This Agreement shall ensure to the benefit of and shall be binding on and enforceable by the parties and their respective successors, personal representatives and permitted assigns (excluding those claims resulting from the acts or omissions of SRG/ILS or of third parties acting under the direction of control of SRG/ILS), which indemnity shall be subject to the same terms and conditions as the one set forth in the immediately preceding paragraph. |



| INDEMNIFICATION | Each party hereby indemnifies and holds the other party harmless against any and all losses and damages (including reasonable legal fees) arising out of any third party claim in respect of any breach of a representation, warranty. condition or promise in this Agreement, as determined by a final settlement agreement between the parties to such threatened or actual litigation (such settlement to be subject to the party's prior approval, acting reasonably) or in a judgment for which all appeals have been exhausted or forfeited (because of time limitation expiry), as made by a court of competent jurisdiction.

Company herein claims and guarantees their full ownership or control of the "Masters" and indemnifies SRG-ILS from any and all third-party clams. |
|---|---|
| RENEWAL/TERMINATION. | The term Will be extended for additional consecutive periods of five (5) years each unless either party notifies the other of its intent not to renew the Term at least 90 days prior to end of Term.

Notwithstanding anything to the contrary contained in this Agreement, this Agreement shall automatically terminate if: a) Company and/or SRG-ILS commits any act of bankruptcy or make an assignment for the benefit of its creditors or takes the benefit of any insolvency law, or of a receiver is appointed for a substantial part of the business or the assets of Company; or, b) Company and/or SRG/ILS ceases to operate in the music industry, this Agreement shall immediately terminate.

In the event of termination, rights Will revert as they would otherwise at the end of the term, and SRG/ILS will remain responsible for paying any monies due Company that were earned prior to the termination. |
| NOTICE: | All notices required or permitted hereunder shall be delivered in person, via overnight courier or registered mail return to the address as set out above. |
| REPRESENTATIONS & WARRANTIES. | Each party hereby represents and warrants to the other that he or it has the full power, right and authority to enter Into and fulfill the obligations under this Agreement. Each party hereby also represents and warrants that he or it is not currently subject to any third-party agreement which would have the effect of prohibiting such party's ability to enter into this agreement or in the event that the party is subject to a third-party agreement, such third party has previously agreed to the entry by the party into this Agreement, evidence thereof to be provided to Company upon request. |
| GENERAL | This Agreement constitutes the entire agreement bebueen the parties hereto with respect to the subject matter hereof and cancels and supersedes any prior understandings and agreements between the parties hereto with respect thereto. This Agreement will be governed by and construed in accordance with the laws of the state of Connecticut. For the purpose of all legal proceedings this Agreement Will be deemed to have been performed in the United States and the courts of Fairfield County will have jurisdiction to entertain any action arising under this Agreement. |

Please signify your agreement with the above terms by signing where indicated below

The SRG/ILS Group LLC - SRG-ILS
Per  Claude Villani  CEO

Date  4/20/21

[illegible second signature block]

# EXHIBIT B

# Holland & Knight

787 Seventh Avenue, 31st Floor | New York, NY 10019 | T 212.513.3200 | F 212.385.9010
Holland & Knight LLP | www.hklaw.com

C. Anthony Mulrain
+1 212-513-3382
Anthony.Mulrain@hklaw.com

October 21. 2024

*Via Certifed Mail and E-mail: mike@srgils.com*

Attention: Michael Cusanelli
SRG/ILS Group LLC
50 Water Street
Norwalk, Connecticut 06854

      Re:    Breach of Contract, Non-Payment and Preservation of Records Letter

Dear Mr. Cusanelli:

Please be advised that this firm represents Kenny Lattimore ("Mr. Lattimore"). We are writing to express concerns regarding the payment of royalties to Mr. Lattimore under the terms of the licensing agreement, dated May 1, 2021 by and between SRG/ILS Group, LLC ("SRG") and SincereSoul Records, LLC, f/s/o Kenny Lattimore (the "Agreement"). As you are aware, prompt and accurate royalty payments are a critical component of the contractual relationship. The non-payment of royalties not only undermines the trust between the parties but also causes significant financial harm.

Pursuant to the Revenue Split section of the Agreement, all Net Receipts will be divided 50% to SRG and 50% to Mr. Lattimore. As such, SRG is obligated to pay mechanical royalties, which is included in the Net Receipts in accordance with the terms specified in the Agreement. Specifically, Mr. Lattimore should have received an accounting of records and quarterly payments within 30 days of March 31st, June 30th, September 30th, and December 31st. Further, Mr. Lattimore's manager ("Q Jones") has followed up with your office on multiple occasions, including, but not limited to, April 12, 2023 and July 25, 2023, but has not received the complete and required quarterly accounting and corresponding payments as stipulated in the Agreement.

According to our records, Mr. Lattimore has only received one check in the amount of $4,400 in April 2023, despite having recouped at least as early of September 2022. To date, Mr. Lattimore has not received royalty payments due to him in the following periods: a) October 2022, b) January 2023, c) July 2023, d) October 2023, e) January 2024 and f) April 2024. This failure to abide by the terms of the Agreement constitutes a material breach of contract.

Page 2

In addition, the Agreement provides Mr. Lattimore the right to conduct an inspection and/or a formal audit of SRG's books and records pertaining to the sales and licensing of the masters and production. Specifically, the Agreement states that Mr. Lattimore or his designated representative may conduct an inspection at his sole expense and/or a formal audit (including, without limitation, the activities of examining, copying, and auditing) of the books and records of SRG, provided that Mr. Lattimore gives SRG at least thirty (30) days prior written notice of a formal audit.

Furthermore, the Agreement stipulates that if any amount is found to be owed to Mr. Lattimore by SRG, and the amount owed is more than 10% of the total amount owed to Mr. Lattimore as of the audit date, SRG shall reimburse Mr. Lattimore for his reasonable, out-of-pocket costs of such audit or inspection.

Mr. Lattimore hereby exercises his right to conduct a formal audit of SRG's books and records, and request that you provide him or his agent(s) with the necessary access and information to do so, including access to records and files to verify the accuracy and completeness of the royalty payments that should have been made. The delivery of this letter will serve as notice of Mr. Lattimore's request to conduct a formal audit. Please confirm in writing your acknowledgment of this request within five (5) business days. Mr. Lattimore remains willing to discuss this matter further and work towards a resolution, but he expects full compliance with payment in accordance with the terms of the Agreement.

Please also consider this letter as Mr. Lattimore's formal demand for immediate payment of all outstanding royalties within the next seven (7) days as well as the prompt arrangement of the files for auditing and the requested accounting.

Should this matter not be fully resolved within due course including the provision of the overdue accounting and royalty payments, as well as the facilitation of the requested audit, Mr. Lattimore will have no choice but to pursue all available legal remedies, including but not limited to filing a lawsuit for breach of contract and seeking damages, including the costs of the audit and legal fees and any interest owed on the delayed payments.

### Preservation of Records

Further, this letter serves as a formal request to preserve all records related to the financial and business transactions between SRG and Mr. Lattimore, especially those relating to royalty payments, streaming revenue, sales from product income and other financial obligations.

Please ensure the preservation of, and provide access to, the following documents:

1. **Royalty Statements**: All royalty reports and statements issued, including detailed breakdowns of income generated from streaming platforms, downloads, sync licenses, physical sales, and other income streams.

Page 3

2. **Financial Records**: Documentation of all payments made to Kenny Lattimore and Sincere Soul Records, LLC, including disbursement records, payment schedules, publishing payments from "Cherish the Day" and any relevant invoices.

3. **Distribution and Marketing Agreements**: Copies of all contracts, amendments, or agreements between SRG and Kenny Lattimore and/or Sincere Soul Records, LLC.

4. **Streaming Data**: All documentation detailing streaming numbers and performance metrics on platforms including, but not limited to, Spotify, Apple Music, Tidal, YouTube, and Amazon Music.

5. **Accounting Reports**: Any internal or external accounting reports, audits, or statements that pertain to the distribution and marketing of Mr. Lattimore's music catalog and product sales.

6. **Marketing and Promotion Expenses:** All documents related to marketing, promotional expenses, and any charges made against income, including advertising campaigns, digital marketing efforts, and PR expenses.

The preservation of these records is crucial to maintaining transparency and ensuring accurate accounting and royalty distributions in an effort to resolve these concerns. Failure to comply with this request will result in legal consequences.

We request that these documents be provided in their original electronic format or in a form that is most accessible for review. Please respond within three (3) business days to confirm receipt of this request and the steps being taken to preserve and provide the requested documents.

We trust that you will respond promptly and work with us to resolve any discrepancies or outstanding issues. Please feel free to reach out to me directly at (215) 513-3200 or Anthony.mulrain@hklaw.com or tanisha.pinkins@hklaw.com if further information is needed.

We look forward to your response and hope we can resolve this matter amicably and swiftly to avoid any further escalation.

Govern yourself accordingly,

HOLLAND & KNIGHT LLP

*/s/ Anthony Mulrain*
Anthony Mulrain

Cc:    claude@srgils.com
       zparka@gmail.com
       cgisidori@gmail.com

# EXHIBIT C

**Schedule of SRG'S Missed Quarterly Royalty Statements & Non-Compliant Payment Periods to Mr. Lattimore & Sincere Soul Records**

a) Quarter ending September 30, 2022 (payment due October 30, 2022)

b) Quarter ending December 31, 2022 (payment due January 30, 2023)

c) Quarter ending March 31, 2023 (payment due April 30, 2023)

d) Quarter ending June 30, 2023 (payment due July 30, 2023)

e) Quarter ending September 30, 2023 (payment due October 30, 2023)

f) Quarter ending December 31, 2023 (payment due January 30, 2024)

g) Quarter ending March 31, 2024 (payment due April 30, 2024)

h) Quarter ending June 30, 2024 (payment due July 30, 2024)

i) Quarter ending September 30, 2024 (payment due October 30, 2024)

j) Quarter ending December 31, 2024 (payment due January 30, 2025)